**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SPEC-TECH-SALES, INC, | : | |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| | : | |
| HARSCO CORPORATION d/b/a Harsco | : | |
| Industrial Patterson-Kelley and | : | |
| CLAPPER COMPANY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Spec-Tech-Sales, Inc. ("Plaintiff" or "Spec-Tech") and hereby files this COMPLAINT against Defendant Harsco Corporation d/b/a Harsco Industrial Patterson-Kelley ("HarscoPK") and Clapper Company ("Clapper"), showing the Court as follows:

## BACKGROUND AND SUMMARY OF CLAIMS

1.      Plaintiff Spec-Tech was a top performing independent representative of Defendant HarscoPK in the Wyoming.   Despite this performance, Defendant HarscoPK breached its independent representative agreement by allowing and encouraging sales by a competing HarscoPK representative in Spec-Tech's exclusive territory in the state.   HarscoPK and Defendant Clapper acted together with the intent to harm Spec-Tech and with knowledge that their conduct would injure Spec-Tech by interfering with Spec-Tech's prospective business relations or expectancies in Wyoming.   Accordingly, Spec-Tech asserts claims of breach of contract, tortious interference with prospective business relations or expectancies, civil conspiracy, aiding and abetting, quantum meruit, unjust enrichment, punitive damages and attorneys' fees.   Spec-Tech also demands a trial by jury.   This case involves application of Pennsylvania law the contract claims and Wyoming law to the tort claims.

## THE PARTIES

2.      Plaintiff Spec-Tech is a Colorado Corporation with its principle office located in Colorado.

3.      Defendant HarscoPK is a Delaware Corporation with its principle place of business at all times relevant to this lawsuit at 350 Poplar Church Road, Camp

Hill, Pennsylvania 17011.  HarscoPK may be served through its registered agent in Pennsylvania.

4.      Defendant Clapper is Montana Corporation with its principle office located in Billings, Montana.   Defendant Clapper may be served through its registered agent in Montana.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because this case involves citizens of different states and the amount in controversy exceeds $75,000.00.

6.      Defendant HarscoPK conducts ongoing business in the State of Pennsylvania and this judicial district and is subject to the personal jurisdiction of this Court.  Defendant HarscoPK and Spec-Tech have agreed to bring contract claims (See Count I) in federal or state courts in Pennsylvania.

7.      Defendant Clapper carried out its tortious conduct in part by purposefully directing sales orders that damaged Plaintiff to Pennsylvania and purchasing products manufactured by Defendant HarscoPK in Pennsylvania.  In addition, on information and belief, Defendant Clapper made phone calls and emails to Defendant HarscoPK in furtherance of its tortious conduct and the tortious conspiracy between the two.  Defendant Clapper has taken specific actions in furtherance of its tortious conduct that establish a connection with the State of

Pennsylvania. Defendant Clapper's conduct has been such that Defendant Clapper could reasonably anticipate being hailed into court in Pennsylvania. Further, and information and belief, Defendants Clapper and HarscoPK also entered into a manufacturer's representative agreement in which Defendant Clapper consents to the jurisdiction of state and federal courts in Pennsylvania. Thus, Defendant Clapper has operated its business with an understanding it may be hailed in to Court here. Defendant Clapper has such minimum contacts with the State of Pennsylvania and that this Court has specific personal jurisdiction of over Defendant Clapper and this jurisdiction comports with the notions of fair play and substantial justice.

8.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTS

**HarscoPK's Business**

9.      HarscoPK is in the business of selling commercial and industrial boilers, water heaters, and related parts and products. It is a recognized industry leader and HarscoPK's products have been in the market for over 135 years. HarscoPK was created when its corporate parent, Harsco Corporation, purchased Patterson-Kelly in or about 1974.

10.      According to its website (www.harscopk.com) HarscoPK boilers and water heaters are often installed in a "wide range of schools, colleges and universities, office buildings, hospitals and many other facilities."

11.    HarscoPK operates through a network of independent manufacturer's representatives.   These representatives are composed of two distinct types: (i) commissioned sales representatives and (ii) resellers.

12.    A HarscoPK commissioned sales representative makes a sale to a wholesaler or end user and then is paid a commission on the sales price that is invoiced to the customer by HarscoPK.  HarscoPK bears the risk of non-payment by the customer.

13.    A HarscoPK reseller buys products directly from HarscoPK at a discount from HarscoPK's list price, marks the products up, and then directly sells these products either to another wholesaler or possibly the end user.   The sales contract with the customer is solely between the HarscoPK reseller and the customer and the reseller bears all risk of non-payment by the customer.

14.    Because of the technical nature of its products, HarscoPK's most successful representatives carry with them a high degree of technical expertise.   This expertise is important because the construction projects in which HarscoPK's boilers or water heaters are used are often designed and specified well be before any HarscoPK representatives make any bids on the projects.  Accordingly, to the degree the HarscoPK representative can develop relationships with engineers, architects, and contractors ahead of time, the more likely the specifications for the project will be so narrow that only a HarscoPK boiler may be utilized.  This scenario is typically

referred to as a "flat specification." With a flat specification, HarscoPK or its reseller can then avoid a costly bidding war and HarscoPK can realize higher prices on boilers it sells either directly or through resellers.

15.    Customer service is also a critical component of any successful HarscoPK representative's business. Because HarscoPK's boilers and water heaters must be installed and commissioned, HarscoPK requires that any start up services must be provided to the end user by HarscoPK factory authorized and trained service personnel. As a result, HarscoPK representatives (both commissioned sales and resellers) build in start-up costs into any bid.

16.    With commissioned representatives, after HarscoPK collects on its invoice, its sends the startup costs to the representative, along with the commission on the sale (commissions are not paid on startup fees).

17.    In the case of resellers, since the reseller is the party contracting with the end user or wholesaler, the reseller collects on its invoice, keeps the startup fees, and sends HarscoPK the agreed upon price for the equipment.

18.    Because boilers and water heaters are dynamic industrial equipment with long life spans, parts wear out. As a result, replacement parts sales are a significant part of HarscoPK's and its resellers' business.

**HarscoPK's Sales Policies**

19.    HarscoPK typically enters in manufacturer's representative agreement with its representatives, who are all deemed to be independent contractors.

20.    Although the standard HarscoPK representative agreement speaks specifically to commissioned sales representatives, the HarskoPK representative agreement allows for resellers. The representative agreement specifically incorporates HarscoPK's Sales Policies that are included in HarscoPK s Representative's Sales Manual.    In its Sales Policies, HarscoPK allows representatives to become "Buy and Resell" representatives, i.e., resellers, subject to payment terms and HarscoPK credit department approval.   HarscoPK's Buy and Resell Policy also specifically includes sales of parts.

21.    HarscoPK's contracts typically provide for an exclusive territory that is assigned to a representative.  Since the representatives are independent contractors, they are allowed to sell complimentary products in the territory, but they are not allowed to sell any products that compete with HarscoPK without prior approval.

22.    HarscoPK's Sales Policies also recognize that there may be instances involving efforts from representatives from different territories.   Such a circumstance typically arises when a representative in one territory has, for example, a relationship with an engineering firm that may be hired by a customer to do specifications in another representative's territory.   The representative with the

7

relationship may cause the engineering firm to flat specify HarscoPK boilers for the project.  In such as case, absent an agreed upon commission or profit split between the representatives, HarscoPK's Sales Policies provide for commission splits along the following lines:

> 40% - Specification (often called "Spec Credit")

> 40% - Purchase Order (given to the representative actually procuring the P.O.)

> 20% - Destination (i.e., Territory Credit)

23.     HarscoPK also has a Code of Conduct incorporated into all of its representative agreements.  According to this Code of Conduct, HarscoPK states that it "believes in acting with integrity at all times, and in every situation" and this obligation extends to every HarscoPK "director, officer, and employee…."

**After Being a Successful Representative for HarscoPK, Rich Apple forms Spec-Tech**

24.     For over 15 years, Richard ("Rich") Apple was affiliated with Defendant HarscoPK.  He first represented HarscoPK first as a sales representative for Engineered Products Company ("EPC"), with territory in both Colorado and Wyoming.  As HarscoPK would quickly learn, Mr. Apple is a thorough man, and his attention to detail is remarkable.  Mr. Apple was effective for HarscoPK because focused on customer service and education.

25.     After years of dedicated service to HarscoPK, in 2012, Mr. Apple began discussions with HarscoPK about forming his own company.  EPC was faltering in its overall efforts for HarscoPK, particularly in Wyoming, and it appeared obvious that Mr. Apple could better serve PK through his own company, which would be called Spec-Tech.

26.     As result of Mr. Apples's conversations with HarscoPK, Spec-Tech was formed on September 25, 2012.

27.     Spec-Tech, however, would be more than Mr. Apple, it would also include his brother and business partner, Pat, his wife Kristine, his daughter Kelsy, and his sons Boden and Dustin.   In short, Mr. Apple and his family were all in on behalf of HarscoPK.

28.     The reason for the name Spec-Tech is simple, the company understood the market and its customers and knew that sales begin long before the bidding process.   Thus, relationships with engineers, training sessions for all customers, outstanding start up and commissioning efforts, and attentive customer follow up were components of, as shown below, Spec-Tech's remarkably successful efforts for HarscoPK.

29.     During Spec-Tech's tenure for HarscoPK, Mr. Apple and his brother, Pat, were so trusted by engineers and end users/owners in the field that they were at times asked to be involved in specifying and providing support for sales in other

regions in which HarscoPK already had established representatives. In these instances, and indeed all of its dealings, Spec-Tech was completely transparent and fair about commission splits, and in many cases made no claims for reimbursement.

**Spec-Tech and HarscoPK - The Beginning (October 1, 2012 – April 30, 2013)**

*Spec-Tech Gets Exclusive Territory in Southeastern Wyoming with the remaining part of State to be served by Defendant Clapper; Spec-Tech Also Expresses Interest in Colorado*

30.   After Spec-Tech was formed, it entered into a Heat Transfer Manufacturer's Representative Agreement (the "Agreement") with HarscoPK on October 1, 2012. A true and correct copy of the Agreement is attached hereto as Exhibit 1.

31.   The Agreement provides that Spec-Tech would be HarscoPK's "exclusive manufacturer's representative" for the following counties in Wyoming: Albany, Carbon, Converse, Fremont, Goshen, Laramie, Natrona, Niobrara, and Platte. See Exhibit 1 at Sec. 1.1 and Exhibit A. Under the Agreement, Harsco expressly covenants that it "will not appoint any other representative within the Territory for the sale of Products and will refer to Representative all inquiries originating from the Territory." Exhibit 1 at Sec. 1.1.

32.   At the time, Spec-Tech was essentially responsible for the southeastern part of Wyoming, with Clapper Company serving the remainder.

33.    Spec-Tech had also expressed its interest in becoming Harsco's representative in Colorado as well, but that position continued to be held by EPC.

***Spec-Tech Immediately Makes its Presence Known in the Market; Spec-Tech Receives Excellent Company Support from HarscoPK; and Clapper Company Underperforms in Wyoming.***

34.    After signing on with HarscoPK, Spec-Tech quickly made its presence known in the field with outstanding product knowledge and customer support.  This translated into growing sales for HarscoPK in Wyoming.

35.    At the time, Spec-Tech was also working with Carson Lushin, who was a very active, field-based regional sales manager for HarscoPK.  Mr. Lushin was frequently engaged in sales calls, technical presentations, and training symposiums with Spec-Tech.

36.    Defendant Clapper, however, was not as technically proficient as Spec-Tech and HarscoPK was aware of this fact.

**The Market Confusion Period (May 1, 2013 – November 2, 2015)**

***HarscoPK Give Spec-Tech More Territory Wyoming Then Waffles on its Commitment; HarscoPK Creates Unnecessary and Damaging Market Confusion; Spec-Tech Suffers While Always Doing the Right Thing.***

37.    As a result of Spec-Tech's excellent performance in Wyoming, on May 1, 2013, HarscoPK awarded additional territory in Wyoming to Spec-Tech.

38.    The Agreement was amended to include all Wyoming Counties but three: Hot Springs County, Johnson County, and Washakie County.  The amended Agreement is attached as Exhibit 2.

39.    Although it was aware of Clapper's lackluster performance in Wyoming, Spec-Tech had not asked to be assigned these additional counties and immediately faced tensions with Clapper Company as a result.

40.    Eventually, HarscoPK notified both Spec-Tech and Clapper that the additional counties had been transferred by mistake, yet HarscoPK took no action to further amend the Agreement.

41.    In addition, HarscoPK failed to give clarity to the market and indeed created additional confusion about exactly who their representative was in Wyoming.  For instance, HarscoPK had listed Spec-Tech as the representative of record on the additional counties on its website and Spec-Tech received calls from customers in Wyoming stating they saw Spec-Tech's name on the website.  A number of these calls came from customers on projects previously sold by Clapper in which Spec-Tech was not involved.  These customers were seeking follow up service and support and Spec-Tech stepped up and helped these customers without compensation.   HarscoPK additionally compounded the confusion in the marketplace by telling engineers and others that Spec-Tech was HarscoPK's rep for Wyoming.

42.   These mixed messages from HarscoPK also created enormous uncertainty for Spec-Tech.  Engineers, owners, and end users were confused about which rep to call.  Spec-Tech's ability to market through seminars and training sessions was also hampered by this uncertainty.  Mr. Apple continued to ask for clarity from HarscoPK but got no direction.

### Carson Lushin Changes Jobs and HarscoPK's Field Sales Support Suffers; Spec-Tech Continues to Do the Right Thing and be Transparent About Commission Splits Without Receiving the Same from Clapper and HarscoPK

43.   In 2014, Carson Lushin, HarscoPK's changed jobs and HarscoPK's field sales support presence significantly declined.  His replacement, Duane Genter, never once went into the field to assist Spec-Tech in its efforts.

44.   Despite these difficulties, Spec-Tech continued to step up and do the right thing.  If a call came into Spec-Tech's office from someone in Clapper's territory, the call was referred to Clapper.  Also, on sales where Spec-Tech owed spec commissions to Clapper, Spec-Tech was transparent about the commissions and timely on the payments.  The same, however, cannot be said of Clapper.  Clapper's repeated failure to honor the HarscoPK commission split policy became a source of consternation for Spec-Tech.  Mr. Apple repeatedly sought help from HarscoPK on the issue and despite assurances from HarscoPK that it would deal with the issue, nothing was ever done and commissions are still owed to Spec-Tech.

*Spec-Tech Expresses Strong Interest in Colorado to HarscoPK But the Territory is Ultimately Awarded to McCoy Sales; Spec-Tech is Awarded HarscoPK's Presidents Award for Outstanding Efforts in the Field; McCoy Sales and Spec-Tech Discuss a Possible Merger; Harsco Drags its Feet on Wyoming Despite Clapper's Poor Performance; Due to Continued Market Confusion and Strain on the Company; Spec-Tech Expresses its Intention to Resign as a PK Representative.*

45.     By 2014 it was apparent that EPC's efforts in Colorado were faltering, and Mr. Apple expressed deep interest to Al Lyon at HarscoPK about Spec-Tech securing Colorado as a territory.

46.     Because of Clapper's poor performance in Wyoming, Mr. Lyon told Mr. Apple that interested in having Spec-Tech expand into all of Wyoming.   Mr. Apple had previously indicated his desire to expand into Wyoming, but he told Mr. Lyon he would consider the expansion only after the Colorado territory issue was resolved.

47.     Spec Tech learned in September 2014 that Colorado had been awarded to McCoy Sales.

48.     Despite Mr. Apple's disappointment about not receiving Colorado, Spec-Tech continued to perform for HarscoPK at the highest level.  So much so that in January 2015, Spec-Tech was awarded HarscoPK's 2014 President's Award for exemplary service, the only HarscoPK rep to receive that award for the year.  Mr. Apple received a number of laudatory emails and comments from HarscoPK regarding this honor.

49.    As 2015 began, the market confusion in Wyoming and Clapper's lack of good faith cooperation was continuing to hamper Spec-Tech's efforts in the market.

50.    Given that Colorado had gone to McCoy sales, on numerous occasions in 2015, Mr. Apple expressed his desire to Al Lyon for Spec-Tech be assigned all of Wyoming.  HarscoPK, however, kept dragging its feet and did little to help resolve the confusion, despite comments from Duane Genter in August 2015 that Clapper was performing poorly in Wyoming and that Spec-Tech should take the entire state and also consider Montana.

51.    During this time, Spec-Tech was in serious discussions with McCoy Sales about a possible buyout or merger.  HarscoPK was aware of these discussions.

52.    By September 2015, the Wyoming territory issue was coming to a head, particularly with the impending retirement of Clapper's President, Doug Clapper.

53.    After losing Colorado to McCoy Sales, Mr. Apple had repeatedly asked for permission for Spec-Tech to proceed as rep of record for the additional counties for which it was listed on the HarscoPK website.  HarscoPK again dragged its feet.

54.    Spec-Tech's frustrations with HarscoPK's conduct continued unabated until late October/early November when Rich Apple told Duane Genter and Al Lyon that Spec-Tech was planning to resign.

**The Exclusive Period (November 3, 2015 – March 31, 2017)**

> *HarscoPK Induces Spec-Tech Not to Resign by Making Spec-Tech the Exclusive Representative for All of Wyoming; Spec-Tech is Finally Free to Grow Wyoming without Market Confusion.*

55.     Concerned with Spec-Tech's plan to resign and to induce Spec-Tech to stay as HarscoPK's representative, on November 3, 2015, in a letter signed by Linda Diffley, HarscoPK amended the Rep Agreement and awarded *all* of Wyoming to Spec-Tech.  See Exhibit 3.

56.     Soon after this happened, Duane Genter asked Rich Apple to hold off on efforts in the new territory until the beginning of 2016, so Duane could shore things up with Clapper.  Again, Rich Apple stepped up, did the right thing, and did what HarscoPK asked.

57.     As 2016 began and with a green light in Wyoming, it was off to the races for Spec-Tech.  Rich Apple and his company were finally free to fully do what they do best, dominate the market with technical expertise and the best customer education, training, and service possible.  HarscoPK was now positioned to get the most out of Spec-Tech's representation in Wyoming.

> *HarscoPK Inexplicably Begins to Undermine Spec-Tech's Efforts in Its Exclusive Territory; Harsco Allows Clapper to Compete with Spec-Tech and Indeed Directs Sales to Clapper; Spec-Tech is Tremendously Damaged by HarscoPK and Clapper's Conduct; HarscoPK Does Nothing To Rectify The Situation*

58.   After inducing Spec-Tech to stay on board and giving it all of Wyoming, seeming from the outset, strange and inexplicable things began to happen to Spec-Tech.

59.   For instance, McCoy Sales, after initially being so interested in either merging with or buying out Spec-Tech in 2015, suddenly reversed course and decided to offer Mr. Apple and brother Pat employment for less money than they were currently making.  This conduct is highly suspicious given that Spec-Tech's territory had just expanded.

60.   Also, despite the freshly minted exclusive agreement with Spec-Tech regarding Wyoming, HarscoPK allowed Clapper to continue to do business in Wyoming and continued to take orders for boilers and water heaters from Clapper in Spec-Tech's exclusive territory.   In fact, HarscoPK was even directing Wyoming customers to Clapper and Clapper was accepting them, all while both parties were fully aware of and informed about Spec-Tech's marketing and sales support efforts throughout the entire state of Wyoming.

61.   As a result, Spec-Tech and Clapper were knowingly and wrongfully interfering with Spec-Tech's prospective business relations and business expectancies in Wyoming since Spec-Tech was a reseller and it alone would contract with the wholesaler or end user of HarscoPK's boilers and water heaters.

62.   These Clapper sales ultimately benefitted HarscoPK, so in essence, on Clapper sales in Wyoming, Spec-Tech was working for HarscoPK for free.  Not only did Spec-Tech lose sales, it also lost start up and commissioning fees which are an integral part of a rep's business and revenue.  The amended Rep Agreement giving Spec-Tech exclusivity in Wyoming was never amended by HarscoPK and HarscoPK never pulled back the reins on Spec-Tech's statewide education, training, and customer service efforts in Wyoming, all while continuing.

63.   Deeply concerned, Rich Apple valiantly tried to resolve this matter with HarscoPK, again stepping up and offering more than the situation demanded. HarscoPK kept promising to fix the matter, yet did nothing.   This inaction was quite costly to Spec-Tech.  HarscoPK accepted orders from Clapper in Spec-Tech's exclusive territory, and HarscoPK inexplicably allowed Clapper to submit competing bids against Spec-Tech in Spec-Tech's territory and HarscoPK later accepted orders based on Clappers bids.   As a result, business that should have gone to Spec-Tech went to Clapper instead.

64.   Spec-Tech also stopped receiving parts orders, a big part of its business, from Wyoming as these orders were being wrongly directed by HarscoPK to Clapper.   As a result, HarscoPK and Clapper were knowingly and wrongfully interfering with Spec-Tech's prospective business relations and business

expectancies for parts sales in Wyoming since Spec-Tech was a reseller and it alone would contract with the wholesaler or end user of HarscoPK parts.

65.    HarscoPK's actions were of no help Spec-Tech's bottom line, business reputation, or ongoing viability as a HarscoPK rep in Wyoming.

66.    Rich Apple repeatedly voiced his concerns to HarscoPK.  In, 2017, after obtaining HarscoPK's Wyoming sales records for 2016, Rich Apple identified to HarscoPK which Clapper sales should have been Spec-Tech sales.  HarscoPK took no action, and despite Rich's prior request that this issue be addressed at the Las Vegas AHR show in February 2017 (at an event oddly attended by Mr. Lyon even though he had retired from HarscoPK), a meeting never happened and the issue remained unaddressed.

> ***Spec-Tech's Bottom Line and Cash Flow Was Severely Impacted by HarscoPK and Clapper's Conduct; With No Resolution in Sight for Spec-Tech, It is Forced To Shut Its Doors; Remarkably, HarscoPK Makes No Effort To Retain Spec-Tech.***

67.    2016 was a tough year for the public sector (a large part of HarscoPK's market in Wyoming) as declining tax revenues from decreasing royalties resulting from the energy markets price collapse came home to roost.  Many projects were canceled, delayed, or downsized.  Wyoming sales diverted to Clapper coupled with Spec-Tech's outlay of time and expense when essentially working for HarscoPK for free on the Clapper sales, severely impacted Spec-Tech's bottom line.

68.   By early 2017, with insufficient cash flow resulting from sales improperly lost to Clapper, the continued threat of the degradation of its exclusive territory (evident through competing bids by Clapper in Wyoming that went uncontested by HarscoPK), and with no resolution by HarscoPK in sight, Mr. Apple had no choice but to shut down Spec-Tech's operations.

69.   Accordingly, on February 28, 2017, Spec-Tech notified HarscoPK of its resignation as a HarscoPK representative, effective March 31, 2017.

70.   HarscoPK's reaction to Spec-Tech's resignation is both puzzling and troubling.  Despite Spec-Tech being receiving the HarscoPK President's award in 2015 and the company's acknowledgement that Clapper was not performing well in Wyoming, HarscoPK astonishingly did nothing.  Not once did the company even suggest that Mr. Apple change his mind.

71.   HarscoPK's conduct in unexplainable, unless it was HarscoPK's desire that McCoy Sales also take over the Wyoming market and have Mr. Apple and his brother work for them.   On information and belief, HarscoPK allowed and encouraged Clapper to continue to do business in Wyoming so that Spec-Tech would suffer and Mr. Apple would have no choice but to become an employee of McCoy Sales.

72.   Regardless of its ultimate motivation, HarscoPK, along with Clapper, acted intentionally, deliberately and recklessly with the intent to harm Spec-Tech

and with knowledge that its conduct would in fact harm Spec-Tech.  Defendants got their way - their wrongful conduct seriously harmed Spec-Tech.

## COUNT I
## BREACH OF CONTRACT
## (Against Defendant HarscoPK)

73.     Plaintiff adopts and incorporates into this Count I the foregoing paragraphs numbered 1 through 72 as if fully set forth herein.

74.     Plaintiff and Defendant HarscoPK had a contract that called for, among other things, exclusivity for Plaintiff in Wyoming beginning in November of 2015. As such, any and all sales directed at Wyoming by HarscoPK were to be made to Plaintiff for resale and all business inquiries coming to HarscoPK from Wyoming were to be directed to Plaintiff.  This did not happen.

75.     The contract between Plaintiff and Defendant HarscoPK also included an implied covenant of good faith and fair dealing.

76.     Defendant HarscoPK breached its contract with Plaintiff in multiple ways and multiple times.

77.     Plaintiff has been damaged by Defendant HarscoPK's multiple breaches of contract and is entitled to recover its damages resulting and flowing from each such breach.  Further, under the contract entered into between Plaintiff and Defendant HarscoPK, Pennsylvania law applies to this breach of contract claim.

## COUNT II
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS OR BUSINESS EXPECTANCY
### (Against Defendants HarscoPK and Clapper)

78.     Plaintiff adopts and incorporates into this Count II the foregoing paragraphs numbered 1 through 77 as if fully set forth herein.

79.     Plaintiff had valid prospective business relations or business expectancies for resale of HarscoPK boilers and water heaters, parts, and related products to wholesalers or end users in Wyoming.

80.     Defendants HarscoPK and Clapper had knowledge of these prospective relations or business expectancies.

81.     Defendants HarscoPK and Clapper intentionally, improperly, and without privilege interfered with these prospective relations or expectancies by preventing Plaintiff from acquiring the prospective relations or expectancies as resales that should have gone to Spec-Tech went to Clapper instead.

82.     Defendants' conduct was wrongful and without regard to Plaintiffs' rights, and was done with the knowledge that Plaintiff would injured by this conduct.

83.     Plaintiff was in fact damaged by Defendants' tortious conduct and is entitled to recover all of its damages resulting therefrom.  Further, under the forum state's choice of law rules, Wyoming law would apply to the claim in this Count II because, among other things, Wyoming was the place the injury occurred, the place

where the conduct causing the injury occurred, and the place where the prospective business relationships interfered with were to be had.

## COUNT III
## CIVIL CONSPIRACY
## (Against Defendants HarscoPK and Clapper)

84.     Plaintiff adopts and incorporates into this Count III the foregoing paragraphs numbered 1 through 83 as if fully set forth herein.

85.     Defendants HarscoPK and Clapper conspired to wrong Plaintiff and tortuously and wrongfully deprive Plaintiff of resale opportunities in Plaintiff's exclusive territory in Wyoming.

86.     Defendants acted in concert and wrongly with the knowledge that their wrongful and tortious actions would harm Plaintiff.

87.     Plaintiff was in fact harmed by Defendants concerted actions.

88.     Plaintiff is entitled to recover all of its damages, including punitive damages, resulting from Defendants' Civil Conspiracy.  Further, for the reasons set forth in Paragraph 83 of this Complaint, under the forum state's choice of law rules, Wyoming law would apply to the claims in this Count III.

## COUNT IV
## AIDING AND ABETTING
## (Defendant HarscoPK)

89.     Plaintiff adopts and incorporates into this Count IV the foregoing paragraph number 1 through 88 as if fully set forth herein.

90.   Defendant Clapper tortuously interfered with Plaintiff's prospective business relationships in Wyoming.

91.   In addition to its own tortious conduct, Defendant HarscoPK aided and abetted Clapper in its wrongful conduct in numerous ways.

92.   Plaintiff was damages by Defendant HarscoPK's wrongful conduct.

93.   Plaintiff is entitled to recover its damages, including punitive damages, from Defendant HarscoPK's wrongful conduct.  Further, for the reasons set forth in Paragraph 83 of this Complaint, under the forum state's choice of law rules, Wyoming law would apply to the claims in this Count IV.

## COUNT V
## QUANTUM MERUIT
## (Against Defendant HarscoPK)

94.   Plaintiff adopts and incorporates into this Count V the foregoing paragraphs numbered 1 through 93 as if fully set forth herein.

95.   During the Market Confusion Period (May 1, 2013 – November 2, 2015), with HarscoPK's knowledge and on its behalf, Spec-Tech made sales education, engineering specification, customer service, and other market development and service efforts in Wyoming that were in Plaintiff's official territory but not the territory for which it was ultimately allowed to be a reseller.

96.   During the Exclusive Period (November 3, 2015 – March 31, 2017), with HarscoPK's knowledge and on its behalf, Spec-Tech made valuable services

such sales education, engineering specification, and other market development efforts in Wyoming

97.    Defendant HarscoPK was aware of these efforts enjoyed sales and earned profits from Plaintiff's efforts, and continues to earn sales and profits in Wyoming based on Plaintiff's efforts.

98.    Plaintiff has not been compensated fully for those efforts by Defendant HarscoPK for the profits earned by HarscoPK during the Market Confusion Period, and Plaintiff also has not been compensated fully for those efforts by Defendant HarscoPK for the profits earned by HarscoPK after Spec-Tech was forced to resign.

99.    Plaintiff has been damaged by Defendant HarscoPK's refusal to give rightful compensation to Plaintiff.

100.    Plaintiff is entitled to recover damages in quantum meruit from Defendant HarscoPK for damages that arose during the Market Confusion Period and the damages arose after Spec-Tech was forced to resign.  These claims are not subject to the contract between Plaintiff and Defendant HarscoPK and would thus be governed by Wyoming law.

### COUNT VI
### UNJUST ENRICHMENT
### (Against Defendant Clapper)

101.    Plaintiff adopts and incorporates into this Count VI the foregoing paragraphs numbered 1 through 100 as if fully set forth herein.

102.   During the Market Confusion Period (May 1, 2013 – November 2, 2015), Defendant Clapper received a benefit, i.e., full compensation relating to certain sales, when a portion of that compensation should have gone to Plaintiff due to Plaintiff's efforts on these sales.

103.   During the Exclusive Period (November 3, 2015 – March 31, 2017), Defendant Clapper was allowed resales to which it was not entitled.

104.   During both the Market Confusion Period and the Exclusive Period, Clapper accepted benefits from Plaintiff's efforts with the knowledge that Plaintiff was expecting compensation therefore, and as a result was unjustly enriched by Plaintiff's efforts.

105.   Plaintiff does not have a contract with Defendant Clapper, and Plaintiff has been damaged by Defendant Clapper's unjust enrichment.

106.   Plaintiff is entitled to recover its damages from Defendant Clapper's unjust enrichment.

### COUNT VII
### UNJUST ENRICHMENT
### (Against Defendant HarscoPK)

107.   Plaintiff adopts and incorporates into this Count VII the foregoing paragraphs numbered 1 through 106 as if fully set forth herein.

108.   During the Market Confusion Period (May 1, 2013 – November 2, 2015), with HarscoPK's knowledge and on its behalf, Spec-Tech conferred benefits

on HarscoPK through sales education, customer service, engineering specification, and other market development and customer efforts in Wyoming that were in Plaintiff's official territory but not the territory for which it was ultimately allowed to be a reseller.

109. During the Exclusive Period (November 3, 2015 – March 31, 2017), on HarscoPK's behest and on its behalf, Spec-Tech conferred benefits on HarscoPK through sales education, customer service, engineering specification, and other market development and customer efforts in Wyoming.

110. Defendant HarscoPK made sales and earned profits from these efforts made that were made by Plaintiff during the Market Confusion Period and continues to earn sales and profits in Wyoming based on the benefits conferred Plaintiff's efforts after Plaintiff Spec-Tech was forced to resign.

111. As a result of Plaintiff's efforts, Defendant HarscoPK was unjustly enriched during the Market Confusion Period.

112. As a result of Plaintiff's efforts, Plaintiff has been and continues to be unjustly enriched since Plaintiff Spec-Tech was forced to resign.

113. Plaintiff has suffered damages from Defendant HarscoPK's unjust enrichment and is recover its damages from such unjust enrichment. Since this unjust enrichment was extra-contractual, Wyoming law applies.

## COUNT VIII
## PUNITIVE DAMAGES
### (Against Defendants HarscoPK and Clapper)

114.   Plaintiff adopts and incorporates into this Count VIII the foregoing paragraphs numbered 1 through 113 as if fully set forth herein.

115.   Defendants HarscoPK and Clapper have acted willfully, wantonly, and recklessly, with a malicious intent to injure Plaintiff and in a reckless disregard of the consequences.   Defendants have acted under such circumstances that a reasonable person would know or have reason to know that such conduct would, in a high degree of probability, result in substantial harm to Plaintiff.

116.   Plaintiff has been damaged by Defendants HarscoPK and Clapper's wrongful conduct.

117.   Plaintiff is entitled to recover punitive damages from Defendants HarscoPK and Clapper's wrongful conduct in an amount to be determined in the enlightened conscience of the jury, not as compensation to Plaintiff, but solely to punish and deter Defendants from such wrongful conduct in the future.  Further, for the reasons set forth in Paragraph 83 of this Complaint, under the forum state's choice of law rules, Wyoming law would apply to the claims in this Count VIII.  To the extent that a claim for punitive damages is not recognized specifically as a separate cause of action, this Count VIII should be considered as a part of the prayer for relief set forth below.

## COUNT IX
## ATTORNEYS' FEES AND EXPENSES OF LITIGATION
### (Against Defendants HarscoPK and Clapper)

118.   Plaintiff adopts and incorporates into this Count IX the foregoing paragraphs numbered 1 through 117 as if fully set forth herein.

119.   Defendants HarscoPK and Clapper have acted have acted willfully, wantonly, and recklessly, with a malicious intent to injure Plaintiff and in a reckless disregard of the consequences.  Defendants have acted under such circumstances that a reasonable person would know or have reason to know that such conduct would, in a high degree of probability, result in substantial harm to Plaintiff.

120.   Plaintiff has been damaged by Defendants HarscoPK and Clapper's wrongful conduct.

121.   Plaintiff is entitled to its reasonable attorneys' fees and expenses of litigation from Defendants HarscoPK and Clapper.  Further, for the reasons set forth in Paragraph 83 of this Complaint, under the forum state's choice of law rules, Wyoming law would apply to the claims in this Count IX.  To the extent that a claim for attorneys' fees is not recognized specifically as a separate cause of action, this Count VIII should be considered as a part of the prayer for relief set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

(a)     that Plaintiff be awarded the full amount of its damages from HarscoPK under Count I of this Complaint against Defendant HarscoPK in an amount to be determined at trial;

(b)     that Plaintiff be awarded the full amount of its damages from Defendants HarscoPK and Clapper, jointly and severally, under Count II of this Complaint in an amount to be determined at trial;  (c)  that Plaintiff be awarded the full amount of its damages from Defendants HarscoPK and Clapper, jointly and severally, under Count III of this Complaint in an amount to be determined at trial;

(d)     that Plaintiff be awarded the full amount of its damages from HarscoPK under Count IV of this Complaint against Defendant HarscoPK in an amount to be determined at trial;

(e)     that Plaintiff be awarded the full amount of its damages from HarscoPK under Count V of this Complaint against Defendant HarscoPK in an amount to be determined at trial;

(f)     that Plaintiff be awarded the full amount of its damages from Defendant Clapper under Count VI of this Complaint against Defendant HarscoPK in an amount to be determined at trial;

(g)     that Plaintiff be awarded the full amount of its damages from Defendant HarscoPK under Count VII of this Complaint against Defendant HarscoPK in an amount to be determined at trial;

(h)     that punitive damages be awarded under Count VIII of this Complaint against Defendants HarscoPK and Clapper in an amount to be determined in the enlightened conscience of the jury, not as compensation to Plaintiff, but solely to punish and deter Defendants from such wrongful conduct in the future;

(i)     that Plaintiff recover under Count IX of this Complaint its reasonable attorneys' fees and other expenses of litigation incurred in seeking redress for the tortious conduct of Defendants HarscoPK and Clapper and that such award be joint and several against Defendants;

(j)     that costs be taxed against Defendants; and

(k)     that Plaintiff shall receive such other and further relief as the Court may deem proper.

**PLAINTIFF SPEC-TECH DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

PILLAR AUGHT LLC


By:     /s/ Stephen Moniak
        Stephen Moniak
        PA Attorney ID No. 80035
        4201 E. Park Circle
        Harrisburg, PA  17111
        (717)  308-9910
        smoniak@pillaraught.com
        *Attorneys for Plaintiff*